# United States District Court
**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| SPIEGEL DEVELOPMENT, INC. | § | |
| | § | |
| v. | § | CASE NO. 4:14-CV-761 |
| | § | Judge Mazzant |
| U.S. BANK NATIONAL ASSOCIATION | § | |
| AS TRUSTEE, SUCCESSOR-IN- | § | |
| N.A., AS TRUSTEE, SUCCESSOR BY | § | |
| MERGER TO LASALLE BANK | § | |
| NATIONAL ASSOCIATION, AS | § | |
| TRUSTEE, FOR BEAR STERNS | § | |
| COMMERCIAL MORTGAGE | § | |
| SECURITIES IN., COMMERCIAL | § | |
| MORTGAGE PASS-THROUGH | § | |
| CERTIFICATES, SERIES 2001-TOP2, and | § | |
| CWCAPITAL ASSET MANAGEMENT | § | |
| LLC | § | |
| | § | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court are Plaintiff's Motion for Summary Judgment (Dkt. #42) and Defendants' Motion for Summary Judgment (Dkt. #43). After reviewing the relevant pleadings, the Court finds that the Plaintiff's Motion for Summary Judgment be granted in part and denied in part and Defendants' Motion for Summary Judgment should be denied.

### BACKGROUND

David Spiegel ("Mr. Spiegel") is the President of Spiegel Development Inc. ("SDI" or "Plaintiff"), and he is the Managing Member of DS Vista Creek LLC ("Vista Creek" or the "Borrower") (Dkt. #42 at p. 2; #47 at p. 3). In February of 2001, the Borrower became indebted pursuant to a Loan (the "Loan") in the principal amount of $3,400,000 (Dkt. #43 at p. 4). The Promissory Note (the "Note") executed in connection with the Loan was secured by a first priority lien on and security interest in the property known as Vista Creek Shopping Center located at 2240 S. IH-35 E, Lewisville, Texas (the "Property") (Dkts. #43 at p. 4; #42 at p. 3).

1

Pursuant to a series of assignments, U.S. Bank National Association ("USB") became the holder of the Note and the related Loan Documents (Dkt. #43 at p. 4).[1] The Loan matured on March 1, 2013, and Vista Creek defaulted due to nonpayment (Dkts. # 42 at p. 5; #42 at p. 3).

CWCAM is the Special Servicer of the Loan (Dkts. #42 at p. 3; #43 at p. 4). Defendants maintain that "in connection with the contemplated sale at issue in this litigation, [CWCAM] served as the Lender's agent." (Dkt. #43 at p. 4). Plaintiff argues that, "[f]ollowing default of the Note, [D]efendant CWCAM, acting as servicer on the loan, considered options of foreclosing on the Property, selling a portion of the Property to TxDot, or selling the Note and collateral documents at auction" (Dkt. #42 at p. 3).

Defendants assert that "[t]he Lender obtained the appointment of a receiver for the Property in the Denton County Texas State Court with Mr. Spiegel's consent." (Dkt. #47 at p. 4). Defendants also claim that "[t]he Lender evaluated business strategies to mitigate or recover its losses in the face of Borrower's default, among which were a condemnation buyout of the Property from the Texas Department of Transportation ("TxDot") and a sale of the Promissory Note on Auction.com." (Dkt. #47 at p. 4). According to Defendants, "Mr. Spiegel was apprised of both options." (Dkt. #47 at p. 4).

Defendants also explain that "[o]n November 13, 2013 the final dual-track business strategy for the Loan was adopted by CWCAM." It states in part:

> The Note will be marketed for sale through Auction.com with a subject-to-reserve price of $1,155,000… Simultaneous with the marketing of the Note, CWCAM will pursue the early condemnation buy-out that the Borrower and Receiver are currently negotiating with TXDOT. The Borrower is expecting an offer by 11/30/13. If the offer from TXDOT is in excess of the $1,185,000 CWCAM as-is

---

[1] USB is Trustee, and is successor-in-interest to Bank of America, N.A., which was Trustee, and was successor by merger to LaSalle Bank National Association, which was Trustee for Bear Stearns Commercial Mortgage Securities Inc., Commercial Mortgage Pass-Through Certificates, Series 2001-TOP2, by and through CWCapital Asset Management LLC, in its capacity as Special Servicer, (the "Lender") and CWCapital Asset Management LLC, in its individual capacity, ("CWCAM") (collectively, "Defendants"). *See* Dkt. #43 at p. 1.

value, the assigned Asset Manager will pull the asset from the Auction.com Note sale.

(Dkt. #47 at p. 4 (citing 43-1)). Defendants maintain that they "informed Mr. Spiegel that the sale on Auction.com would be pulled if a satisfactory offer was received from TxDot." (Dkt. #47 at pp. 4-5). On December 12, 2013 Plaintiff won the auction for the Note. (Dkt. #42 at p. 4). The Loan Sale Agreement ("LSA") was entered between Lender and Plaintiff SDI that day with the purchase price of $1,325,000.00 (Dkt. #42 at p. 4). According to Plaintiff, "[o]n December 18, 2013, seller's counsel provided Mr. Spiegel with a fully executed LSA and informed him that the closing would take place in January." (Dkt. #43 at p. 4).

On December 30, 2013, the receiver received an offer from TxDot in the amount of $3,093,328.00 for a portion of the Property (Dkts. #42 at p. 4; #47 at p. 5).[2] According to Plaintiff, "[o]n January 15, 2014, a representative of the Seller notified Mr. Spiegel that the 'Initial Closing Date under the [LSA] for the Vista Creek Shopping Center loan is being extended to February 21, 2014 (the 'Extended Closing Date').'" (Dkt. #42 at p. 5). Then, on January 27, 2014, CWCAM informed Mr. Spiegel that the Lender would not be moving forward with the sale to SDI because it had accepted the TxDot offer (Dkts. #42 at p. 5; #47 at p. 5).

According to Defendants, "[o]n November 5, 2014, after SDI engaged in negotiations with TxDot, the Receiver, CWCAM, and USB agreed to accept $3,918,938 from TxDot for a portion of the Property." (Dkt. #42 at p. 6). Defendants also maintain that

> [d]uring the pendency of this case, Vista Creek, SDI, USB, the receiver, CWCAM and an escrow agent entered into a Disbursement and Escrow Agreement that required the TxDot proceeds to be deposited into escrow, and that from those proceeds (a) the receivership expenses would be paid; (b) USB would be paid $1,325,000 representing the purchase price under the LSA; and (c) the prevailing party in this lawsuit would receive the net balance, subject only to the performance of the terms of sale in the LSA.

---

[2] According to Defendants, "[a]t the time of the TxDot offer the Loan had a balance of $2,884,277.57." (Dkt. #47 at p. 5)

3

(Dkt. #42 at p. 6). Plaintiff asserts a claim for breach of contract.[3]

On October 5, 2015, Plaintiff filed its Motion for Summary Judgment (Dkt. #42). On November 2, 2015, Defendants filed their response (Dkt. #47). On November 16, 205 Plaintiff files its reply (Dkt. #48). On November 23, 2015, Defendants file their sur-reply (Dkt. #51).[4]

On October 6, 2015, Defendants filed their Motion for Summary Judgment (Dkt. #43). On November 2, 2015, Plaintiff files its response (Dkt. #46). On November 16, 2015, Defendants filed their reply (Dkt. #49).

## LEGAL STANDARD

The purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits "[show] that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The trial court must resolve all reasonable doubts in favor of the party opposing the motion for summary judgment. *Casey Enters., Inc. v. Am. Hardware Mut. Ins. Co.*, 655 F.2d 598, 602 (5th Cir. 1981) (citations omitted). The substantive law identifies which facts are material. *Anderson*, 477 U.S. at 248.

The party moving for summary judgment has the burden to show that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Id.* at 247. If the

---

[3] Plaintiff also requested that the Court decree that "SDI is the owner and holder of the $3,400,000 Promissory Note and that [Vista Creek] is the current debtor of the Promissory Note and that all portions of the Note and collateral documents are valid and in full force and effect." (Dkt. #15 at ¶ 40). However, as discussed in footnote eight, Plaintiff appears to have dropped its request for specific performance.

[4] On November 25, 2015, Plaintiff filed its sur-sur-reply (Dkt. #52). However, Plaintiff did not ask for leave of the Court. Therefore, the Court will not consider the sur-sur-reply because "[a]bsent leave of court, no further submissions on the motion are allowed." Local Rule CV-7(f).

4

movant bears the burden of proof on a claim or defense on which it is moving for summary judgment, it must come forward with evidence that establishes "beyond peradventure *all* of the essential elements of the claim or defense." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). Where the nonmovant bears the burden of proof, the movant may discharge its burden by showing that there is an absence of evidence to support the nonmovant's case. *Celotex*, 477 U.S. at 325; *Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 424 (5th Cir. 2000). Once the movant has carried its burden, the nonmovant must "respond to the motion for summary judgment by setting forth particular facts indicating there is a genuine issue for trial." *Byers*, 209 F.3d at 424 (citing *Anderson*, 477 U.S. at 248-49). The nonmovant must adduce affirmative evidence. *Anderson*, 477 U.S. at 257. No "mere denial of material facts nor . . . unsworn allegations [nor] arguments and assertions in briefs or legal memoranda" will suffice to carry this burden. *Moayedi v. Compaq Computer Corp.*, 98 F. App'x 335, 338 (5th Cir. 2004). Rather, the Court requires "significant probative evidence" from the nonmovant in order to dismiss a request for summary judgment supported appropriately by the movant. *United States v. Lawrence*, 276 F.3d 193, 197 (5th Cir. 2001). The Court must consider all of the evidence, but must refrain from making any credibility determinations or weighing the evidence. *See Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007).

## ANALYSIS

The disputes at issue in this case are limited to contractual interpretation. "Under Maryland law, the interpretation of a contract, including the determination of whether a contract is ambiguous, is a question of law." *Gresham v. Lumbermen's Mut. Cas. Co.*, 404 F.3d 253, 260 (4th Cir. 2005).[5] "Summary judgment is appropriate when the contract in question is

---

[5] The parties agree that in construing the LSA, the Court should apply Maryland Law (Dkts. #42 at p. 7 (citing 42-21 at § 11.11 ("This Agreement shall be construed, and the rights and obligations of the Seller and the Buyer hereunder

unambiguous or when an ambiguity can be definitively resolved by reference to extrinsic evidence." *Washington Metro. Area Transit Auth. v. Potomac Inv. Properties, Inc.*, 476 F.3d 231, 235 (4th Cir. 2007). "A contract is not ambiguous merely because the parties do not agree to its meaning." *Maslow v. Vanguri*, 896 A.2d 408, 420 (2006). "To prevail in an action for breach of contract, the plaintiff must prove that the defendant owed the plaintiff a contractual obligation and that the defendant breached that obligation." *Taylor v. NationsBank, N.A.*, 776 A.2d 645, 651 (2001).

*Conditions Precedent*

Plaintiff maintains that "[D]efendants have failed to close on the sale of the Note as required by the LSA." (Dkt. #42 at p. 8). Plaintiff argues that "[a]s a result of Defendants' election in its January 15, 2014 letter, the closing on SDI's purchase of the Note was required to occur on or before February 21, 2014 (the 'Extended Closing Date')." (Dkt. #42 at p. 8 (citing Dkts. #42-9; #42-21)). Plaintiff states that "[i]t is undisputed that Defendants purported to terminate the LSA without any legal justification prior to the Extended Closing Date and have refused to close on SDI's purchase of the Note." (Dkt. #42 at p. 8).

Defendants state that "SDI cannot establish the Lender's breach of the [LSA] because the conditions precedent that inured to the benefit of the Lender were never satisfied." (Dkt. #43 at p. 12). Plaintiff argues that there was no "failure of the conditions precedent in § 5.2(b) and (d) of the LSA" (Dkt. #46 at p. 8). Section 5.2 states:

> Conditions for the Benefit of Seller. Notwithstanding anything in this Agreement to the contrary, Seller's obligation to sell and assign the Assigned Rights and Obligations shall be subject to and contingent upon the satisfaction (or waiver by Seller) of the following conditions precedent to or on the Closing Date:
> ( . . . )

---

determined, in accordance with the local law of the State of Maryland.")); #43 at pp. 8-9).

> (b) All Closing documents necessary to consummate the transaction as contemplated in this Agreement shall have been executed and delivered by Buyer as required by this Agreement.
>
> ( . . . )
>
> (d) Receipt by Seller of all requisite approvals including, but not limited to, the approval of servicers, trustee approval and all other approvals that may be required pursuant to any documents which govern Seller, and the waiver or assignment of any purchase option rights as required under the documents which govern Seller.

(Dkt. #42-22 § 5.2(b) and (d)).

Under Maryland law, "[w]here a contractual duty is subject to a condition precedent . . . there is no duty of performance and there can be no breach by nonperformance until the condition precedent is either performed or excused." (Dkt. #43 at p. 12 (citing *Goldberg v. Anastasi*, 321 A.2d 155, 157 (1974); 6 A. Corbin, Contracts § 1252, at 2 (1962) (same); *Myers v. Kayhoe*, 892 A.2d 520, 529-30 (2006) (explaining that an original contract was void for failure of a condition precedent))). Therefore, Defendants assert that since "the Lender had no contractual obligation to sell under the [LSA] because the conditions precedent in Section 5.2 were unfulfilled . . . there has been no breach of the [LSA] by the Lender." (Dkt. #43 at p. 12).

Defendants assert that they were not obligated to make the sale unless and until they got approval of the sale from CWCAM (Dkt. #43 at p. 12). Plaintiff maintains that "Defendants simply ignore the limiting language that the approvals discussed in § 5.2(d) are limited to those "that may be required pursuant to any documents which govern Seller . . ." (Dkt. #46 at p. 9 (citing Dkt. # 42-21 § 5.2(d))). Plaintiff argues that "[t]here is no evidence in the record that CWCAM's approval of USB's sale of the Note was required by any documents that govern USB." (Dkt. #46 at p. 9).

Defendants assert that "Plaintiff misconstrues this section to mean that the 'approval of servicers' is limited to approvals of servicers that are 'required pursuant to any documents which

govern Seller.'" (Dkt. #47 at p. 11 (citing Dkt. #46 at p. 9)). Defendants argue that a plain reading of this section demonstrates that "[t]he approval of servicers, such as CWCAM, is not limited to 'all other approvals that may be required pursuant to any documents which govern the seller'" (Dkt. #47 at p. 11). Defendants go on to state that "[a] [p]roper grammatical construction of the LSA requires that the descriptive modifier 'that may be required pursuant to any documents which govern Seller' applies only to the immediately preceding term 'all other approvals' and not to the separately delineated approvals of 'servicers' and 'trustees.'" (Dkt. #47 at p. 11).[6] The Court agrees that a plain reading of this section of the contract demonstrates that the approval requirement is not limited to approvals required pursuant to governing documents. Therefore, the Court finds that USB was required to get approval from 'required' servicers, even if such a requirement was not included within a governing document.

Plaintiff maintains that CWCAM's internal planning memorandum of November 14, 2013 "is merely an outline of CWCAM's plan as of that date and creates no requirement that CWCAM approve USB's sale of the Note, and it most certainly is not a document that 'governs' USB." (Dkt. #46 at p. 9). Plaintiff also asserts that there is no agreement between USB and CWCAM that contains such a requirement (Dkt. #46 at p. 9). Whether or not CWCAM is a

---

[6] According to Defendants, "[w]hen a comma is used to set off a modifying phrase from other clauses it indicates that the 'language is to be applied to all of the previous phrases and not merely the immediately preceding phrase.'" (Dkt. #47 at p. 11 (citing *Elliot Coal Min. Co. v. Dir., Office of Workers' Comp. Programs*, 17 F.3d 616, 630 (3d Cir. 1994))). Therefore, Defendants maintain that "in the LSA the modifying phrase 'that may be required pursuant to any documents which govern the Seller' is not set off separately by a comma, and therefore applies only to its last antecedent 'all other approvals,' not to every word or phrase in the section as Plaintiff argues." (Dkt. #47 at pp. 11-12) (citations omitted).

The Court agrees with Plaintiff that "Maryland law . . . does not make the absence of a comma dispositive of whether a modifying clause at the end of a series of items is meant to govern all of the items." (Dkt. #48 at p. 7 (citing *Laurel Race Course, Inc. v. Regal Const. Co. Inc.*, 333 A.2d 319, 327 (1975) (rejecting a construction that "would permit a simple comma to alter what we regard as the clear intent of the agreement"); *McCree v. State*, 105 A.3d 456, 465-66 (2014) (last antecedent rule does not apply where the sense of the entire provision requires that a qualifying clause applies also to several preceding words); *Emp't. Sec. Admin. V. Weimer*, 400 A.2d 1101, 1105 (1979) (construing phrase "pension or annuity under a private pension plan" and rejecting the view that the modifying phrase "under a private pension plan" modifies only the word "annuity"))). Therefore, the Court's interpretation is based on a plain reading of the agreement.

8

'required' servicer, and whether or not CWCAM actually gave the requisite approval, are questions of fact.

Plaintiff argues that "even if CWCAM were required to approve the sale, it indisputably did so on December 13, 2013 when it executed the Auction Contract, where CWCAM is listed as 'Seller,' and the LSA, where CWCAM signed 'in its capacity as Special Servicer.'" (Dkt. #46 at p. 10 (citing Dkts. #42-19 at pp. 1604, 1611; #42-21 at p. 1638)).[7] However, it is a question of fact whether CWCAM's signature represents its action solely as an agent for USB, or if it signed and thereby expressed its approval of the agreement, as the Special Servicer. Therefore, whether or not CWCAM was a 'required' servicer whose approval was necessary under section 52(d), and whether CWCAM gave such approval, are both questions of fact appropriate for a jury's consideration.

Defendants also assert that Plaintiff is prevented from any recovery in this matter because it failed to comply with section 5.2(b). Defendants contend that "[i]t is undisputed that SDI never executed any of the Closing Documents that evidenced the assignment of the Loan Documents, which was required by the [LSA]." (Dkt. #43 at p. 6). Defendants states that "[f]or this reason alone, the Lender is entitled to summary judgment on all of Plaintiff's claims." (Dkt. #43 at p. 12).

Plaintiff maintains that "Defendants' unilateral refusal to close cannot be an excuse for their breach of the LSA." (Dkt. #42 at p. 10). "It is well settled that, where cooperation is necessary to the performance of a condition [in a contract], a duty to cooperate will be implied,

---

[7] Plaintiff also argues that Defendants cannot argue that CWCAM's "approval of both the Auction Contract and the LSA was subject to a subsequent TxDot offer, because there is no such condition in either document and because CWCAM's personnel made express and contemporaneous admissions that the auction sale was not subject to such a condition." (Dkt.46 at p. 10). *See* Dkt. #42 at p. 10 (citing Dkts. #42-13; #42-15). However, the Court does not need to address this argument because it does not appear that Defendants are asserting that any approval was given with such a condition but is instead arguing that no approval was given by CWCAM in its capacity as a special servicer, and references the subsequent TxDot offer to explain why approval was not given.

9

and that a party owing such a duty cannot prevail if such failure operates to hinder or prevent performance of the condition." *Dexter v. Dexter*, 661 A.2d 171, 174 (1995) (quoting *Alois v. Waldman*, 149 A.2d 406, 409 (1959)). Plaintiff argues that "[Plaintiff], at all relevant times, insisted that Defendants go to closing and refused to accept a refund of its deposit until the Disbursement Agreement was negotiated in August of 2015." (Dkt. #48 at p. 4). Plaintiff also points out that "[i]t is undisputed that SDI demanded that USB go to closing and that USB refused." (Dkt. #46 at p. 11 (citing Dkt. # 42-40 ¶ 14)). Defendants do not appear to dispute that Plaintiff attempted to close and that the closing documents were not served as a result of its own actions. Therefore, the Court finds that to the extent that Defendants assert that they are entitled to prevail because Plaintiff failed to fulfill the condition precedent set for in section 5.2(b), Plaintiff's motion for summary judgment is granted and Defendants may not rely on section 5.2(b) as an excuse for their non-performance.

*Defendants' Breach*

After a careful review of the record and the arguments presented, the Court is not convinced that Plaintiff has met its burden by demonstrating that there are no material issues of fact entitling it to judgment as a matter of law. The issue should proceed to trial.

*Plaintiff's Performance*

After a careful review of the record and the arguments presented, the Court is not convinced that Plaintiff has met its burden by demonstrating that there are no material issues of fact entitling it to judgment as a matter of law. The issue should proceed to trial.

*Parties to the Agreement*

After a careful review of the record and the arguments presented, the Court is not convinced that Defendants have met their burden by demonstrating that there are no material issues of fact entitling it to judgment as a matter of law. The issue should proceed to trial.

*Relief Sought*

Defendants maintain that the relief sought by Plaintiff is barred by the LSA, and therefore Defendants assert that they are entitled to summary judgment on all of Plaintiff's claims (Dkt. #43 at p. 2). Defendants argue that section 9.1(a) of the LSA clearly states that "[Plaintiff] agreed to waive any right to specific performance, other equitable relief and money damages, and further agreed that its sole and exclusive remedy for any purported breach of the [LSA] by the Lender was a return of its Deposit" (Dkt. #43 at p. 8).

Plaintiff argues that "Defendants' interpretation of § 9.1(a) is flawed." (Dkt. #42 at p. 13). Plaintiff maintains that section 9.1(a) "serves as an 'impossibility of performance' escape clause for Seller" (Dkt. #42 at p. 13). Section 9.1(a) states that

> [i]f (i) the conditions precedent set forth in Section 5.2 shall have been satisfied or waived in writing by Seller, (ii) Buyer shall have performed fully or tendered performance of its obligations hereunder and (iii) Seller shall be unable or fail to perform its obligations hereunder, Seller shall be allowed a reasonable opportunity to cure such failure or inability to perform. If such failure or inability to perform cannot be cured, then Buyer, as its sole and exclusive remedy, shall terminate this agreement by written notice delivered to Seller and Escrow Holder and the entire amount of the Deposit shall be delivered by Escrow Holder to Buyer. In such event of termination of the Agreement, … Buyer specifically acknowledges and agrees that … (B) Buyer may not recover any consequential or punitive damages resulting from Seller's breach of the Agreement, and (C) Buyer waives any right to specific performance or other equitable relief.

(Dkt. #42-20).

Plaintiff points out that "Defendants' interpretation of § 9.1(a) of the LSA is also in conflict with § 8.2 of the LSA." (Dkt. #42 at p. 14). Plaintiff explains that "[p]ursuant to § 8.2,

11

SDI agreed to release Defendants 'except for claims or causes of action arising by reason of Seller's breach of this Agreement.'" (Dkt. #42 at p. 14 (citing Dkt. #42-20 § 8.2)). According to Plaintiff, "[i]f § 9.1(a) were interpreted as limiting SDI's recovery for breach of contract when the conditions precedent to waiver under that section had not been met, then the carveout in § 8.2 would be rendered superfluous." (Dkt. #42 at p. 14).

Maryland law holds that, "[a] recognized rule of construction in ascertaining the true meaning of a contract is that the contract must be construed in its entirety and, if reasonably possible, effect must be given to each clause so that a court will not find an interpretation which casts out or disregards a meaningful part of the language of the writing unless no other course can be sensibly and reasonably followed." *See DIRECTTV, Inc. v. Mattingly*, 829 A.2d 626, 637 (2003). The Court agrees that Defendants' interpretation of section 9.1(a) would render section 8.2 superfluous. Therefore, the Court finds that Plaintiff is entitled to recover damages other than the return of its deposit, but only if Plaintiff also proves that Defendants were able to cure.[8]

Plaintiff argues that because Defendants' failure to perform could be cured, section 9.1(a) is inapplicable (Dkt. #42 at pp. 13-14). Defendants argue that their failure to perform could not currently be cured because the Note has been extinguished (Dkt. #51 at pp. 7-8). However, the Court agrees with Plaintiff that whether or not Defendants can currently cure their alleged breach is irrelevant (Dkt. #48 at p. 7). However, whether or not Defendants were able to cure the

---

[8] Plaintiff initially argued for specific performance (Dkts. #42 at pp. 14-15; #46 at pp. 15-16), but stopped seeking that remedy and now asserts that it is entitled to monetary damages. Plaintiff states that it is not seeking an order unwinding Defendants sale of property to TxDot (Dkt. #48 at p. 6). Plaintiff goes on to explain that
> It seeks a judgment that Defendants are in breach of the LSA and are liable for attorneys' fees, with the remedies to be determined later by the Court. The primary remedy will be the disposition of the proceeds of the sale of Borrower's property, as provided in the Disbursement Agreement. That agreement provides that the net proceeds remaining in the account (after the August 2015 disbursement to Defendants of $1,325,000 representing the note price under the LSA and disbursement to the Receiver for certain expenses) should be disbursed to either Defendants or SDI based on this Court's decision in this case. The remedy is not only possible; it has been agreed upon by all of the parties to this litigation.

(Dkt. #48 at p. 6) (citations omitted). Therefore, the Court will not address whether specific performance would have been an appropriate remedy in the current case.

alleged breach in 2014 is a question of fact. *See* Dkts. #46 at p. 12; #47 at p. 13. Therefore, the Court holds that summary judgment should be granted in favor of Plaintiff's claim that it is not barred from seeking damages if it proves that Defendants could have cured at the time of the alleged breach.

Therefore, whether or not such relief should be granted in the current case is a question of fact. After a careful review of the record and the arguments presented, the Court is not convinced that Plaintiff or Defendants have met their burden by demonstrating that there are no material issues of fact entitling them to judgment as a matter of law. The issue should proceed to trial.

*Attorneys' Fees and Costs*

After a careful review of the record and the arguments presented, the Court is not convinced that Plaintiff or Defendants have met their burden by demonstrating that there are no material issues of fact entitling them to judgment as a matter of law. The issue should proceed to trial.

## CONCLUSION

It is therefore **ORDERED** that Plaintiff's Motion for Summary Judgment (Dkt. #42) is hereby **GRANTED IN PART AND DENIED IN PART**. Defendants may not assert the defense that they were excused from performance because Plaintiff violated section 5.2(b) of the LSA. Plaintiff is not barred from seeking damages if it is able to prove that Defendants could cure at the time of the breach.

It is further **ORDERED** that Defendants' Motion for Summary Judgment (Dkt. #43) is hereby **DENIED**.

**SIGNED this 29th day of June, 2016.**

_____
AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE